<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THAIS L. BROUILLETTE,<br><br>           Plaintiff,<br><br>     v.<br><br>CITIMORTGAGE, INC., CENLAR, and POWERS KIRN, LLC,<br><br>           Defendants. | Civil Action No. 23-04304 (GC) (JBD)<br><br><u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon the Motions to Dismiss (ECF Nos. 13 & 14) Plaintiff Thais L. Brouillette's Complaint (ECF No. 1-3) filed by Defendants CitiMortgage, Inc. (CitiMortgage); Cenlar, FSB (Cenlar); and Powers Kirn, LLC, pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6). Plaintiff opposed, and Defendants replied. (ECF Nos. 15-18.) The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    Factual Background[1]

In January 2017, Plaintiff took out a mortgage secured by her property located in Long

---

[1]    On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts in the Amended Complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

Branch, New Jersey.  (ECF No. 1-3 ¶¶ 1, 8-9.)  Later that year, the Mortgage was assigned to CitiMortgage.  (*Id.* ¶ 10.)  In March 2019, CitiMortgage alleged that Plaintiff failed to make payments, and on January 3, 2020, CitiMortgage filed a foreclosure action against Plaintiff in the Superior Court of New Jersey, Monmouth County.  (*Id.* ¶ 11; ECF No. 14-2 at 35-60.[2])  On March 22, 2022, the state court issued a final judgment after Plaintiff failed to plead or otherwise defend in the foreclosure action.  (ECF No. 14-2 at 64-66.)  The property was sold at a sheriff's sale on July 5, 2022, after which Plaintiff filed an emergency motion to set aside the sheriff's sale.  (ECF No. 1-3 ¶¶ 12-14; ECF No. 14-2 at 68-69.)

In an order dated October 21, 2022, the New Jersey Superior Court vacated the sheriff's sale and directed CitiMortgage to (1) review a loan modification application submitted by Plaintiff "as if no sheriff's sale had occurred"; (2) advise Plaintiff in writing within seven days of receipt of the application whether it was complete, and if not, what documents were necessary to make it complete; (3) advise Plaintiff in writing either that she was qualified for a loan modification, or why the application was denied; and (4) provide Plaintiff with opportunities to appeal the denial

---

[2]     Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

Generally, this Court may only consider the pleadings when deciding a motion to dismiss. *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002).  But this Court may consider documents attached to a motion to dismiss "whose authenticity no party questions, but which are not physically attached to the pleading" if the documents "are referred to in the plaintiff's complaint and are central to the claim." *Id.*  And "in deciding a motion to dismiss, a district court is permitted to review matters of public record and take judicial notice of a prior judicial opinion." *Smith v. Lynn*, 809 F. App'x 115, 117 (3d Cir. 2020) (finding that a court properly relied on decisions by a state court in related proceedings on a motion to dismiss).  Here, Plaintiff relies on her mortgage, note, the mortgage's assignment to CitiMortgage, and the underlying foreclosure action in the Superior Court of New Jersey throughout her Complaint.  (*See* ECF No. 1-3 ¶¶ 8-15, 62-64, 82-84.)  Powers Kirn attached the mortgage, note, mortgage assignment, and decisions from the foreclosure action in support of its Motion to Dismiss (ECF Nos. 14-1 & 14-2), and Plaintiff does not dispute their authenticity.  Accordingly, the Court will consider the documents at ECF No. 14-2 as integral to the allegations in the Complaint.

and "to sell the property and pay [CitiMortgage] in full."  (ECF No. 14-2 at 68-69.)

Plaintiff alleges that prior to the state court order vacating the sheriff's sale, Plaintiff "submitted a complete Modification application" to Cenlar, CitiMortgage's loan servicer, "via fax and priority mail."  (ECF No. 1-3 ¶ 17.)  Plaintiff also emailed a copy of the application to Powers Kirn, LLC, the law firm that represented CitiMortgage in the foreclosure action.  (*Id.*)  The application included a cover letter indicating that Plaintiff's counsel was an "authorized Third Party" on Plaintiff's account and instructing Cenlar to send all future correspondence to Plaintiff's counsel.  (*Id.*)

On November 4, 2022, Powers Kirn advised Plaintiff that Cenlar had no pending loss mitigation application and that she needed to submit a new package.  (*Id.* ¶ 18.)  According to Plaintiff, a series of exchanges followed where counsel for Plaintiff repeatedly submitted additional documents in response to Cenlar's requests, with Cenlar and Powers Kirn failing to timely respond to Plaintiff's submissions and advising Plaintiff that the application was incomplete without adequately specifying what documents were missing.  (*Id.* ¶¶ 20-43.)  Cenlar allegedly reached out directly to Plaintiff on several occasions requesting additional documents or advising that Plaintiff's application was incomplete, despite being instructed that it should communicate only through Plaintiff's counsel.  (*Id.* ¶¶ 21-22, 28-29, 34.)  In February 2023, Plaintiff received an email directly from Cenlar informing her that her application was incomplete and that "additional information could be obtained" through Cenlar's online portal. But according to Plaintiff, Cenlar had locked Plaintiff out of the portal.  (*Id.* ¶ 28.)  Plaintiff's counsel asked both Cenlar and Powers Kirn what additional documents were needed, and neither responded.  (*Id.* ¶¶ 29-33.)  Plaintiff's counsel repeatedly contacted Cenlar and Powers Kirn about the status of the application and received only intermittent responses.  (*Id.* ¶¶ 29-40.)

3

Eventually, after weeks of silence from Cenlar and Powers Kirn, Plaintiff was notified in June that her property had again been listed at a sheriff's sale. (*Id.* ¶¶ 38- 41.) Plaintiff's counsel moved to stay the sheriff's sale. (ECF No. 14-2 at 71.) On September 8, 2023, the state court cancelled the pending sheriff's sale, ordered CitiMortgage to comply with the October 21, 2022 order, directed CitiMortgage's future correspondence to be sent to Plaintiff's Counsel, and allowed Plaintiff to "pursue any and all claims against [CitiMortgage, Cenlar, and Powers Kirn], in a separate action, without issue of 'Entire Controversy.'" (*Id.* at 71-72.)

### B.     Procedural History

On July 6, 2023, Plaintiff filed her Complaint in New Jersey Superior Court, Monmouth County, Docket No. MON-L-002105-23. (ECF No. 1-3.) The Complaint asserts six causes of action. Count One is against Cenlar for violations of "Regulation X," 12 C.F.R. § 1024.41. Count Two is a claim under the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8-2, *et seq.*, against CitiMortgage and Cenlar. Count Three asserts a breach of the covenant of good faith and fair dealing against all Defendants. Count Four is against Cenlar and Powers Kirn for violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692. Count Five is a claim of "Respondeat Superior" against all Defendants. Count Six is a claim under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605, against Cenlar. The Defendants removed the case to federal court,[3] and their Motions to Dismiss followed. (ECF Nos. 13 & 14.)

## II.     <u>STANDARD OF REVIEW</u>

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of

---

[3]     The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state-law claims under § 1367(a).

the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements."  *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim."  *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020).

## III.   DISCUSSION

### A.    Counts One & Six — "Regulation X" and RESPA, 12 U.S.C. § 2605

RESPA, 12 U.S.C. §§ 2601-2617, is "a consumer protection statute that regulates the real estate settlement process," and is designed to protect borrowers from "certain abusive practices" by real estate loan servicers.  *Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 591 (D.N.J. 2016) (quoting *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 124 (3d Cir. 2010)); 12 U.S.C. § 2601(a).  RESPA's implementing regulations, known as "Regulation X" and codified at 12 C.F.R. §§ 1024.1 to 1024.41, "prescribe additional duties and responsibilities of mortgage servicers under RESPA."  *Id.*; *see also In re Rosa*, Civ. No. 17-27826, 2018 WL 4352168, at *3 (Bankr. D.N.J. Aug. 9, 2018).  These additional duties and responsibilities include the "loss mitigation procedures" outlined in § 1024.41 of Regulation X.  A "loss mitigation option" is "an alternative to foreclosure"

that owners or assignees of mortgage loans may offer through a loan servicer to borrowers facing potential foreclosure.  12 C.F.R. § 1024.31.  While § 1024.41 imposes no duty on a servicer to provide borrowers with a specific loss mitigation option, the servicer must follow the procedures outlined in § 1024.41 if it offers such an option to borrowers.  § 10241.41(a).  For example, within five days of receipt of a borrower's "loss mitigation application," a servicer must acknowledge receipt, advise the borrower that the application is either complete or incomplete, and if incomplete, identify the additional documents and information that the borrower needs to provide.  § 1024.41(b)(2)(i).

Here, Plaintiff alleges in Count One that Cenlar violated § 1024.41 in three ways: (1) "failing to, upon receipt of [Plaintiff's] loss mitigation application, review the loss mitigation application to determine if the loss mitigation application is complete"; (2) "failing to notify [Plaintiff] in writing within 5 days after receiving the loss mitigation application that the servicer acknowledges receipt . . . and . . . has determined that the loss mitigation application is either complete or incomplete"; and (3) if the application was incomplete, failing to inform Plaintiff of "the additional documents and information [Plaintiff] must submit to make the loss mitigation application complete."  (ECF No. 1-3 ¶¶ 47-49.)  Cenlar argues that it was no longer servicing Plaintiff's loan after the final foreclosure judgment was entered against Plaintiff.  (ECF No. 13-1 at 9.)  Therefore, Cenlar was not a "servicer" and was not bound by the "loss mitigation procedures" in Regulation X, which only apply to mortgage loan "servicers."  (*Id.*)  Thus, as a threshold matter, the Court must determine whether Cenlar was a "servicer" subject to RESPA and Regulation X's "loss mitigation procedures," despite the fact that a judgment of foreclosure was already entered against Plaintiff at the time she submitted her application.  *See Rosa*, 2018 WL 4352168, at *3.

### 1. RESPA and New Jersey's "Merger" Doctrine

Under RESPA, a "servicer" is "the person responsible for servicing of a loan." 12 U.S.C. § 2605(i)(2). "'Servicing' is defined as 'receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making payments of principal and interest and such other payments . . . as may be required pursuant to the terms of the loan.'" *Rosa*, 2018 WL 4352168, at *3 (citing 12 U.S.C. § 2605(i)(3)).

Cenlar argues that under New Jersey's "merger" doctrine, Plaintiff's loan ceased to exist post-foreclosure judgment and Cenlar was therefore no longer "servicing" a loan at the time Plaintiff submitted her application. Indeed, the normal rule under New Jersey law is that "once a judgment of foreclosure is entered, the mortgage loan is extinguished and merges into the final judgment of foreclosure" because "the decree represents the final determination of debt." *See* Myron C. Weinstein, *New Jersey Practice, Law of Mortgages*, 30A N.J. Prac. § 31.36 (2d ed. 2023) (collecting cases).

Under New Jersey's "merger" doctrine, multiple courts in this Circuit have found that plaintiffs cannot bring a claim under RESPA or Regulation X after a foreclosure judgment because "there is no longer a 'servicer' subject to Regulation X."[4] And at least three courts in this district appear to have dismissed RESPA claims stemming from loss mitigation applications that the plaintiffs submitted "'after the foreclosure judgment,' but apparently prior to the sale of the property." *See Roman*, 2018 WL 2958583, at *2 (citing *Perez*, 2017 WL 5513687, at *4)

---

[4]      *Id.* (first citing *Genid v. Fed. Nat'l Mortg. Ass'n and Seterus, Inc.*, Civ. No. 15-6787, 2016 WL 4150455 (D.N.J. Aug. 2, 2016); then citing *Perez v. Seterus Inc*., Civ. No. 17-5862, 2017 WL 5513687, at *4 (D.N.J. Nov. 16, 2017); then citing *Roman v. Wells Fargo Bank, N.A.*, Civ. No. 16-9472, 2018 WL 2958583, at *4 (D.N.J. Jun. 13, 2018); and then citing *Kajla v. U.S. Bank Nat'l Ass'n for Credit Suisse First Boston MBS ARMT 2005-8*, Civ. No. 17-8953, 2018 WL 1128498, at *7 (D.N.J. Mar. 1, 2018), *aff'd*, 806 Fed. App'x 101 (3d Cir. 2020)).

(dismissing Plaintiff's RESPA claims because "final judgment was entered . . . well prior to Plaintiffs' mailing of their loan modification application" and therefore, "Defendants were not 'servicers' under RESPA at the time Plaintiffs submitted their loss modification application"); *Gonzalez v. Wells Fargo Home Mortg.*, Civ. No. 18-11405, 2019 WL 4196142, at * (D.N.J. Jul. 25, 2019) (finding that the plaintiff's post-judgment, pre-sale loss mitigation application could not form a RESPA claim).

But other courts in this district have declined to apply New Jersey's merger doctrine where, after a foreclosure judgment but before a sheriff's sale, a defendant was alleged to have violated Regulation X's loss mitigation procedures while continuing to act like a "servicer" under RESPA. *See Garmon v. Community Loan Servicing, LLC*, Civ. No. 22-5974, 2024 WL 489566, at *8 (D.N.J. Feb. 8, 2024) ("[T]here is a district split on the issue of whether RESPA continues to apply to [loan servicers] after issuance of a foreclosure judgment and prior to a foreclosure sale in light of New Jersey's merger doctrine." (citing *Mannarino v. Ocwen Loan Servicing, LLC*, Civ. No. 17-2564, 2018 WL 1526558, at *1-2 (D.N.J. Mar. 28, 2018)).   These courts have found that the plain language of several provisions in Regulation X "broaden[s] the scope of a servicer's obligations" beyond the moment a foreclosure judgment is entered.  *See Mannarino*, 2018 WL 1526558, at *4. For example, Regulation X "prohibits a servicer from conducting a judicial sale after the 'borrower has submitted a complete loss mitigation application.'"  *Id.* (citing § 1024.41(g)(1)–(2)).  But a foreclosure sale "cannot occur absent a final judgment."  *Rosa*, 2018 WL 4352168, at *5.  Thus, the regulation's plain language imposes obligations on servicers beyond a foreclosure judgment, "at least until the judicial sale is completed," in contrast to New Jersey's "merger" doctrine. *Mannarino*, 2018 WL 1526558, at *4.  The court in *Mannarino* also noted that Regulation X "broadly defines 'servicer,'" and "[w]ithin that definition, there is no reference to any 'merger'

theory." *Id.*  And the defendant servicer in *Mannarino* continued to behave like a servicer even after judgment was entered by continuing to communicate with the plaintiff, recognizing the plaintiff's right to appeal the foreclosure judgment, and acknowledging that RESPA applied when it extended its own time to assess the plaintiff's loss mitigation application. *Id.* at *4-5.  Given the servicer's behavior and the regulation's plain language, the court found that "the merger doctrine should not apply" and "lacks merit under the circumstances." *Id.*

Since *Mannarino*, other courts in this district have found that because Regulation X references foreclosure sales, "the only reasonable reading of the regulations is that a party must still be considered a 'servicer' up to at least that point, despite the entry of a final judgment in foreclosure." *See Rosa*, 2018 WL 4352168, at *4-5 (finding that adopting New Jersey's merger doctrine would have the effect of making several provisions of Regulation X "superfluous"); *In re Coppola*, 596 B.R. 140, 155-160 (Bankr. D.N.J. 2018) (rejecting the defendant's argument "that the definition of 'servicer' or 'servicing' does not include" the duties prescribed by the loss mitigation procedures in § 1024.41 because "the Court would have to ignore essentially all of the provisions of these sections that describe in detail what the servicer needs to do in responding to . . . Loss Mitigation applications" submitted post-judgment); *Loconsole v. Wells Fargo Mortg.*, Civ. No. 17-8362, 2018 WL 3158816, at *5-6 (D.N.J. Jun. 28, 2018) (noting that the "loss mitigation procedure section" of Regulation X "appears to distinguish between a final judgment and a foreclosure sale," and therefore assuming on a motion to dismiss "that RESPA's loss mitigation procedures apply after a New Jersey court has entered a final judgment of foreclosure but before a foreclosure sale has taken place").  Like in *Mannarino*, the court in *Rosa* also examined the defendant servicer's post-judgment behavior and found that "at every relevant step since final judgment," the defendant "held itself out" as a servicer.  2018 WL 4352168, at *5.  It was

disingenuous, the court reasoned, for the defendant "to act as a servicer . . . and then claim it does not fill that role only after its methods were questioned." *Id.*

Against this backdrop of caselaw, Plaintiff brings Count One under § 1024.41, which imposes obligations on Cenlar beyond a foreclosure judgment "at least until the judicial sale is completed." *Mannarino*, 2018 WL 1526558, at *4. The Court agrees with the reasoning in *Mannarino* and *Rosa* that adopting the "merger" theory under these circumstances "would have the effect of making several regulations superfluous." *Rosa*, 2018 WL 4352168, at *5; *see also Coppola*, 596 B.R. at 147-48, 155 (finding that "as a matter of common sense," the defendant was obligated to follow the loss mitigation procedures in Regulation X even after the application was submitted after a judgment of foreclosure); *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005) ("It is a well-known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous."). Because § 1024.41 of Regulation X references foreclosure sales, which cannot occur until after a final judgment is entered, "the only reasonable reading of the regulations is that a party must still be considered a 'servicer' up to at least [the foreclosure sale], despite the entry of a final judgment." *Rosa*, 2018 WL 4352168, at *5; *see also Coppola*, 596 B.R. at 163 (finding that Regulation X's loss mitigation procedures apply to servicers post-judgment under the same reasoning).

Additionally, like in *Mannarino* and *Rosa*, the merger theory "lacks merit" under the specific circumstances of this case. *Mannarino*, 2018 WL 1526558, at *5. While the Superior Court of New Jersey did not vacate the actual foreclosure judgment against Plaintiff, it found good cause to vacate the sheriff's sale that had already taken place. (ECF No. 14-2 at 68-69.) The state court then expressly ordered Cenlar to (1) advise Plaintiff whether her loan modification application was complete; (2) advise Plaintiff what information Cenlar needed if the application

was incomplete; and (3) review Plaintiff's loan modification application, all "as if no sheriff sale has occurred." (*Id.*)   In other words, the state court ordered Cenlar to comply with the responsibilities prescribed to servicers under § 1024.41 of Regulation X.   *See* 12 C.F.R. §§ 1024.41(b)-(c).   And after the state court judgment, Cenlar continued to act in some ways like a servicer.   Like the defendants in *Mannarino* and *Rosa*, Cenlar allegedly continued to communicate with Plaintiff about her loss mitigation application after foreclosure judgment had been entered. *See Mannarino*, 2018 WL 1526558, at *4-5; *Rosa*, 2018 WL 4352168, at *5.   Cenlar is alleged to have repeatedly asked Plaintiff to provide more information regarding her application, and even directed Plaintiff in an email to submit additional information through Cenlar's online portal. (ECF No. 1-3 ¶¶ 18-43.)   It would be perverse to allow for a scenario where Cenlar can consider Plaintiff's loss mitigation application post-judgment and pre-foreclosure sale — a situation expressly contemplated by Regulation X — only to find that Cenlar can escape liability for violating loss mitigation procedures under a strict application of New Jersey's "merger" doctrine.[5] *See Coppola*, 596 B.R. at 155.   These circumstances are distinguishable from other cases in this district that dismissed RESPA claims stemming from post-judgment loss mitigation applications. In those cases, there were no allegations that the defendants continued to act like servicers post-judgment.   *See, e.g.*, *Gonzalez*, 2019 WL 4196142, at *1 ("Several months [after a final judgment of foreclosure], Plaintiffs submitted a completed loan modification application to Defendant. Defendant responded shortly thereafter, stating that it would not consider Plaintiffs for loss mitigation.").

---

[5]      The New Jersey Supreme Court has stated that "the doctrine of merger is an equitable principle that requires an examination of all the facts and circumstances." *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1117 (N.J. 2011) (declining to find that the "merger" doctrine precluded a claim under the NJCFA based on a forbearance agreement between a servicer and borrower that was executed post-foreclosure judgment).

Accordingly, given the specific circumstances of this case and the plain language of §
1024.41, the Court finds that the merger doctrine does not bar Plaintiff's claims under RESPA and
Regulation X.  The Court will therefore proceed to the sufficiency of Plaintiff's claims.

### 2.        Count One – Violations of Regulation X, 12 C.F.R. § 1024.41

Cenlar argues that even if its post-judgment conduct is subject to Regulation X, Plaintiff
has failed to plausibly assert violations of § 1024.41.  (ECF No. 13-1 at 8-9.)  The Court disagrees.
Plaintiff has described multiple specific instances where, after receiving Plaintiff's loss mitigation
applications, Cenlar failed to acknowledge receipt "in writing within 5 days" and advise Plaintiff
"that the loss mitigation application is either complete or incomplete."  *See* 12 C.F.R. §
1024.41(b)(2)(i)(B); (ECF No. 1-3 ¶¶ 23-24, 27-28, 33-43).  Even when Cenlar notified Plaintiff
that the application was incomplete after the five-day deadline, it often failed to advise Plaintiff of
"the additional documents and information . . . to make the loss mitigation application complete"
and a "reasonable date" by which Plaintiff should submit such documents.  § 1024.41(b)(2)(i)-(ii);
(ECF No. 1-3 ¶¶ 24-30).  Finally, Plaintiff alleges that by March 2023, after Plaintiff had sent
Cenlar additional documents on several occasions at Cenlar's request, Plaintiff's application was
"complete," and that Cenlar failed to review and evaluate the complete application.   §
1024.41(c)(1); (ECF No. 1-3 ¶¶ 16, 36-37).  While Cenlar was not obligated to provide Plaintiff
"with any, much less a particular, loan mitigation option,"[6] "Plaintiff here is expressly *not*
challenging the loss mitigation denial."[7]  Instead, Plaintiff alleges that Cenlar failed to comply
with the basic loss mitigation procedures prescribed in Regulation X.  (ECF No. 1-3 ¶¶ 44-49.)  *Cf.*

---

[6]       *Wilson v. RoundPoint Mortg. Serv. Corp.*, Civ. No. 21-19072, 2022 WL 3913318, at *5
(D.N.J. Aug. 31, 2022).

[7]       *Coppola*, 596 B.R. at 158.

*Wiggins v. Hudson City Savings Bank*, 2015 WL 4638452, at *6-7 (Bankr. D.N.J. Aug. 4, 2015) (dismissing a plaintiff's claim under Regulation X challenging the merits of the defendant servicer's denial of loss mitigation options.)  And as Plaintiff correctly argues, a borrower may enforce the provisions of § 1024.41 under "section (6) of RESPA (12 U.S.C. § 2605(f))."  § 1024.41(a).  Accordingly, Plaintiff has stated a claim against Cenlar under § 1024.41 of Regulation X and RESPA § 2605(f).[8]  Cenlar's Motion to Dismiss is denied as to Count One.

### 3.    Count Six – Violation of RESPA, 12 U.S.C. § 2605(e)

Under RESPA, a "qualified written request," or QWR, "is a written request from the borrower (or an agent of the borrower) for information relating to the servicing of" a "federally related mortgage loan."  12 U.S.C. § 2605(e)(1)(A).  When a servicer receives a QWR, the servicer must acknowledge receipt within five days and, within thirty days, either make corrections to the account or provide a written explanation declining to take any action.  *See* § 2605(e)(2).  Here, Plaintiff alleges that the requests for information about her loss mitigation application sent through her attorney were QWRs under RESPA, and that Cenlar "failed to respond in a proper and timely way."  (ECF No. 1-3 ¶¶ 101-102.)

In response, Cenlar argues that "letters complaining about loss mitigation issues are not QWRs that trigger duties under RESPA," citing a single case in the United States District Court for the Western District of Texas.  (ECF No. 13-1 at 8-9 (citing *Medina v. Parkside Lending, LLC*,

---

[8]    RESPA allows for recovery of "any actual damages to the borrower," including compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence." *Cortez v. Keystone Bank, Inc.*, 2000 WL 536666, at *12 (E.D. Pa. May 2, 2000); 12 U.S.C. § 2605(f)(1)(A).  Cenlar does not challenge the sufficiency of Plaintiff's alleged damages, which include the costs of preparing and submitting repeated applications, legal fees to stop the second sheriff's sale, and costs for certifying mailings and loan modification documents.  (ECF No. 1-3 ¶ 56.)

2022 WL 5585750, at *3-4 (W.D. Tx. Aug. 22, 2022)).  Indeed, *Medina* collects multiple cases standing for the general rule that "communications regarding loss mitigation or loan modifications do not qualify as [Notices of Error] or QWRs" because they do not concern the loan's "servicing." 2022 WL 5585750, at *3-4 (collecting cases).  The Third Circuit has also found that a written request for information must relate specifically to a loan's servicing in order to constitute a QWR. *See Cole v. Wells Fargo Bank, N.A.*, 790 F. App'x 460, 464-65 (3d Cir. 2019) (holding that a plaintiff's request for the "original, ink-signed note for the mortgage" was not a QWR because it did "not concern payments, amounts in accounts, or servicing requests," but dealt with "the origination of the loan" (citing *Martini v. JPMorgan Chase Bank, N.A.*, 634 F. App'x 159, 164 (6th Cir. 2015) ("Loan modification requests do not qualify as QWRs because they do not relate to the loan's servicing."))).  Even the court in *Rosa* — which found that the defendant was a "servicer" obligated to follow Regulation X's loss mitigation procedures post-foreclosure judgment — held that the plaintiff's communications about a loan modification did not relate to the "servicing" of a loan because "the definition of servicing under RESPA is more limited [than the definition of a 'servicer']."  2018 WL 4352168, at *9.

Here, Plaintiff does not plausibly allege that her attorney's letters about her loss mitigation application related to Cenlar's servicing of Plaintiff's loan.  Nor is this case like *Herrera v. Central Loan Administration & Reporting*, where the plaintiff's letter constituted a QWR because it requested not only loss mitigation options, but also "the servicing file, . . . the amount needed to reinstate the loan, and . . . an accounting of all payments received."  Civ. No. 17-4774, 2017 WL 4548268, at *3 (D.N.J. Oct. 12, 2017).  Moreover, Plaintiff appears to have abandoned her claim under Count Six, as she "did not offer any argument in opposition to [Cenlar's] motion to dismiss this claim." *See Sevajian v. Castro*, Civ. No. 20-1591, 2022 WL 17733675, at *3 n.1 (D.N.J. Dec.

6, 2022); *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005) (explaining that failure to respond to an opponent's arguments "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the [opponent]").[9]  For these reasons, Plaintiff has not sufficiently alleged that her attorney's letters about her loss mitigation application were QWRs under RESPA.  Count Six is therefore dismissed.

### B.      Count Two – Violations of the NJCFA

The NJCFA prohibits, in relevant part, "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance" thereof.  N.J. Stat. Ann. § 56:8-2.  To state a claim under the NJCFA, a consumer must plead (1) an unlawful practice, (2) an ascertainable loss, and (3) a causal relationship between the two.  *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011).  The NJCFA is intended to "be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud," and therefore is "liberally construed in favor of the consumer."  *Id.*  (citations omitted).

Here, the alleged unlawful conduct is Cenlar's and CitiMortgage's post-foreclosure judgment actions "related to Plaintiff['s] loss mitigation application," which Plaintiff describes as "unconscionable" and deceptive.  (ECF No. 1-3 ¶¶ 52-55.)  Plaintiff alleges that she suffered ascertainable harm as a result, including the opportunity to receive a loan modification "at lower interest rates than available today," the costs of preparing and submitting repeated applications,

---

[9]      A plaintiff's request for information related to a loss mitigation application may trigger a servicer's duty to respond under 12 C.F.R. §§ 1024.35 and 1024.36.  *Coppola*, 596 B.R. at 161-62.  But Plaintiff does not bring Count Six under these provisions, nor does she attempt to oppose Cenlar's motion to dismiss Count Six.

and costs for certifying mailings and loan modification documents.  (*Id.* ¶ 56.)

Cenlar and CitiMortgage move to dismiss Plaintiff's NJCFA claim on the basis that the "NJCFA is not applicable . . . because CitiMortgage and Cenlar were no longer engaged in the subsequent performance of a loan after final judgment was entered in the foreclosure action." (ECF No. 13-1 at 10.)  Defendants do not cite any authority suggesting that the "merger" doctrine unconditionally precludes NJCFA claims.  Instead, they cite *Gonzales v. Wilshire Credit Corp.*, 25 A.3d 1103, 1117 (N.J. 2011), for the general proposition that a loan no longer exists after a foreclosure judgment is entered.  (ECF No. 13-1 at 10.)  But the *Gonzales* decision also held that the NJCFA applies to post-foreclosure judgment forbearance agreements between a servicer and borrower, contradicting Defendants' argument that the "merger" doctrine categorically precludes NJCFA claims.  25 A.3d at 1117-18.  And other courts have allowed NJFCA claims to proceed for a servicer's conduct that occurred post-foreclosure judgment.  *See, e.g.*, *Hager v. CitiMortgage, Inc.*, Civ. No. 16-03348, 2018 WL 11246771, at *9 (D.N.J. Feb. 27, 2018) (allowing a plaintiff to file an amended NJFCA claim based on a servicer's refusal to honor a loan modification agreement that was executed after a final foreclosure judgment); *Ogbebor v. J.P. Morgan Chase, N.A.*, Civ No. 16-3400, 2017 WL 449596, at *1 (D.N.J. Feb. 2, 2017) (dismissing the plaintiff's NJCFA claim "for conduct that predates the state court judgment of foreclosure," but granting the plaintiff "leave to file an Amended Complaint to assert an NJCFA claim against [the defendant loan servicers] for conduct post the foreclosure judgment").  Finally, this Court has already declined to apply the merger doctrine to the specific facts of this case in the context of Plaintiff's Regulation X claim, and declines to do so here for the same reasons.  Accordingly, Plaintiff's NJCFA claims are not barred merely because they relate to conduct that occurred after a foreclosure judgment was entered in state court.

Other than arguing that the merger doctrine bars Plaintiff's claim, Defendants do not challenge the sufficiency of any element of Plaintiff's claim under the NJCFA.  (*See* ECF No. 13-1 at 9-10.)  Plaintiff alleges that Cenlar's and CitiMortgage's post-foreclosure judgment conduct "related to Plaintiff['s] loss mitigation application" was "unconscionable" and deceptive, and resulted in ascertainable harm.  (ECF No. 1-3 ¶¶ 52-56.)  While Defendants cite the three elements necessary to sustain a claim under the NJCFA, Defendants offer no argument showing that Plaintiff has failed to plausibly allege any unlawful conduct, ascertainable loss, or a causal relationship between the two.  (*See* ECF No. 13-1 at 9 (citing *Wilson v. RoundPoint Mortg. Serv. Corp.*, Civ. No. 21-19072, 2022 WL 3913318, at *5 (D.N.J. Aug. 31, 2022)).  The Court denies Defendants' argument that the merger doctrine categorically prohibits a claim under the NJCFA, and because Defendants do not further challenge the sufficiency of Plaintiff's claim, the Court will allow the claim to proceed.

### C.      Count Three – Breach of the Covenant of Good Faith and Fair Dealing

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Perkins v. Wash. Mut., FSB*, 655 F. Supp. 2d 463, 472 (D.N.J. 2009) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121 (N.J. 2001)).  "A party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000). Put differently, the doctrine "calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract,'" even if the parties do not breach the express terms of the contract. *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (quoting *Palisades Props., Inc. v. Brunetti*, 207 A.2d 522 (N.J. 1965)).

17

In Count Three, Plaintiff accuses all Defendants of breaching an implied covenant of good faith and fair dealing by acting "in bad faith" when they violated the loss mitigation procedures of Regulation X and the state court's order.  (ECF No. 1-3 ¶¶ 59-60.)  Plaintiff also bases this claim on Defendants' communicating directly with Plaintiff "when they knew she was represented," and "depriving Plaintiff "of the opportunity to obtain a Loan Modification."  (ECF No. 1-3 ¶¶ 57-67.)

In response, Powers Kirn argues that Plaintiff cannot sustain a claim against it because Plaintiff has not alleged a contractual relationship between Plaintiff and Powers Kirn.  (ECF No. 14-3 at 12.)  The Court agrees.  "Without a contract, there is no duty of good faith and fair dealing." *Perkins*, 655 F. Supp. 2d at 472.  Plaintiff argues that Powers Kirn, as an agent of Cenlar and/or CitiMortgage, acted in bad faith by failing to relay communications between Plaintiff, Cenlar, and CitiMortgage, and by contacting Plaintiff directly when it knew that she was represented by counsel.  (ECF No. 16 at 10-11.)  But Plaintiff does not allege anywhere in the Complaint that Powers Kirn ever contacted Plaintiff directly.  (*See* ECF No. 1-3 ¶ 33 (alleging that Cenlar sent a letter directly to Plaintiff).)  More importantly, Plaintiff provides no legal basis showing that even if an agency relationship existed between Cenlar, CitiMortgage, and Powers Kirn, such an "agency relationship could create privity of contract" between Plaintiff and Powers Kirn.  *See, e.g.*, *Flynn-Murphy v. Jaguar Land Rover N. Am., LLC*, Civ. No. 20-14464, 2021 WL 5448716, at *8 (D.N.J. Nov. 19, 2021) (dismissing plaintiffs' breach of contract claims against a vehicle manufacturer where the plaintiffs only ever contracted with the vehicle dealer, noting that plaintiffs could not "provide legal authority demonstrating that an agency relationship" between the manufacturer and the dealer "could create privity of contract" between the plaintiffs and the manufacturer).  Accordingly, Count Three is dismissed as to Powers Kirn.

As for Cenlar and CitiMortgage, Plaintiff argues that their failure to comply with

Regulation X, "acknowledge the application, communicate with counsel," and "comply with the Chancery Court Order" amounts to a breach of the covenant of good faith and fair dealing implicit in the mortgage contract, which Plaintiff sought to modify through a loan mitigation application. (ECF No. 15 at 15.)  But even if Cenlar and CitiMortgage had a contractual relationship with Plaintiff through the mortgage agreement, Plaintiff has not pled that Defendants have done "'anything which will have the effect of destroying or injuring the right of [Plaintiff] to receive' the benefits of the contract,'" — i.e., the mortgage agreement — because nothing in the mortgage contract allowed Plaintiff to modify the loan.  *See Brunswick*, 864 A.2d at 395; *Genid*, 2016 WL 4150455, at *5 (dismissing a breach of implied covenant claim because "nothing in the mortgage allows for repurchase of the Subject Property after foreclosure sale").  Plaintiff argues that Defendants "acted in bad faith and unfairly" to frustrate Plaintiff's rights under Regulation X and the state court order, both of which required Defendants to review Plaintiff's loss mitigation application. (ECF No. 1-3 ¶¶ 58-64.)  But Plaintiff has not alleged that Defendants frustrated any of Plaintiff's rights stemming from the *mortgage contract*, which does not provide that Defendants must evaluate any requests to modify the agreement.  (*See* ECF No. 14-2 at 9-28.)  *Cf. Mannarino*, 2018 WL 1526558, at *6 (allowing a claim for breach of the covenant of good faith and fair dealing to proceed to discovery to determine "whether Defendant was contractually obligated to service Plaintiff's loan through its evaluation of loss mitigation options upon Plaintiff's default").  Put differently, Plaintiff has alleged that Defendants acted in bad faith while performing the duties imposed by Regulation X and a state court order, but not "in the performance of a contractual obligation," which is fatal to Plaintiff's claim.  *See Black Horse Lane*, 228 F.3d at 288; *Genid*, 2016 WL 4150455, at *5.  For these reasons, Count Three of Plaintiff's Complaint is dismissed.

### D.     Count Four – FDCPA

To state a claim under the FDCPA, a plaintiff must allege that "(1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014).  "Because the FDCPA is a remedial statute, courts 'construe its language broadly so as to effect its purposes.'"  *Garmon*, 2024 WL 489566, at *3 (quoting *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011)).

Cenlar challenges the third element of Plaintiff's claim, arguing that because the property had already been foreclosed through the entry of a foreclosure judgment, the loan merged with the judgment.  Therefore, Cenlar's communications were not "an attempt to collect a debt" and merely concerned "options to save the home from foreclosure."  (ECF No. 13-1 at 11.)  But the "Third Circuit has held that debt collection communications are not 'limited to specific requests for repayment,' and include communications 'conveying information regarding a debt.'"  *Mannarino*, 2018 WL 1526558, at *7 (quoting *Allen*, 629 F.3d at 368 n.5 (finding that a letter that did not make a "specific request for repayment" could be subject to the FDCPA)); *see also McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 245 (3d Cir. 2014) ("[R]equests for financial information may be part of a dialogue to facilitate satisfaction of the debt and hence can constitute debt collection activity.").  Here, although a final foreclosure judgment had already been entered, the state court specifically vacated a sheriff's sale and ordered the creditor of the debt, CitiMortgage, to review Plaintiff's loan modification application.  (ECF No. 14-2 at 68-69.)  Thus, Cenlar's statements to Plaintiff and her attorney about the completeness of her application could reasonably be characterized as "requests for financial information" that were "part of a dialogue

to facilitate satisfaction of a debt" under the FDCPA's broad definitions of "communication" and "debt." *McLaughlin*, 756 F.3d at 245; *Mannarino*, 2018 WL 1526558, at *7 (finding that a servicer's "communications about the loss mitigation process constitute debt collecting communications" under the FDCPA); 15 U.S.C. § 1692a(2), (5) (defining "communication" as "the conveying of information regarding a debt," and "debt" as any "alleged obligation of a consumer to pay money arising out of a transaction in which the . . . property . . . [is] primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment"). Furthermore, Plaintiff has sufficiently alleged that Cenlar's communications violated specific provisions of the FDCPA, including § 1692c(a)(2) for communicating directly with Plaintiff despite knowing that she was represented by an attorney; and § 1692e for using "false, deceptive, or misleading representation or means in connection with the collection of any debt" by claiming that Plaintiff's application was incomplete without advising what documents were missing. (ECF No. 1-3 ¶¶ 74-79.) For these reasons, Plaintiff has stated a plausible claim under the FDCPA against Cenlar.

Separately, Powers Kirn asks the Court to dismiss Plaintiff's FDCPA claim against it by finding, pursuant to the United States Supreme Court's decision in *Obduskey v. McCarthy & Holthus LLP*,[10] that Powers Kirn is not a "debt collector" subject to all of the requirements of the FDCPA but is merely an enforcer of security interests subject only to the limited requirements of 15 U.S.C. § 1692f(6).

"In *Obduskey*, the Supreme Court held that entities enforcing a security interest by initiating a *nonjudicial foreclosure* are debt collectors under 1692a(6)'s secondary definition, and thus are bound by the limitations prescribed by section 1692f(6)." *Riotto v. SN Servicing Corp.*,

---

[10]   586 U.S. 466 (2019).

Civ. No. 19-13921, 2022 WL 1261532, at *3 (D.N.J. Apr. 27, 2022).  Here, Powers Kirn asks the Court "to extend *Obduskey* to situations, like here, where an entity in the business of attempting to enforce security interests does so through a *judicial foreclosure*."  *See id.*  But other courts within the Third Circuit "have declined to extend *Obduskey* to cases beyond those involving nonjudicial foreclosures."  *Id.* (collecting cases); *Ennis v. Shapiro & Denardo, LLC*, Civ. No. 20-14788, 2021 WL 5298506, at *2 (D.N.J. Nov. 15, 2021) (declining to apply *Obduskey* because other district courts "have treated law firms in the business of judicial foreclosures as debt collectors under the FDCPA" (citation omitted)).  As Powers Kirn concedes, the Third Circuit has yet to consider whether the holding in *Obduskey* extends to judicial foreclosures, and the consensus in this district "appears to be that [courts] will wait for controlling authority extending the holding of *Obduskey* to judicial foreclosures."  (ECF No. 14-3 at 17.)  This Court, therefore, declines to apply *Obduskey* here, where Powers Kirn has attempted to enforce a security interest through a judicial foreclosure.  And by alleging that Powers Kirn threatened and then attempted to conduct a sheriff's sale in violation of the state court order, Plaintiff sufficiently alleged that Powers Kirn "sought to collect monies due on a mortgage" in violation of § 1692e(5).  *Ennis*, 2021 WL 5298506, at *2.  (ECF No. 1-3 ¶¶ 82, 84.)  For these reasons, the Court denies Defendants' motions with respect to Count Four.

### E.      Count Five – Respondeat Superior

"The respondeat superior doctrine 'recognizes a vicarious liability principle pursuant to which a master will be held liable in certain cases for the wrongful acts of his servants or employees.'"  *DiAntonio v. Vanguard Funding, LLC*, 111 F. Supp. 3d 579, 585 (D.N.J. 2015) (quoting *Allia v. Target Corp.*, Civ. No. 07-4130, 2008 WL 1732964, at *6 (D.N.J. Apr. 10, 2008)). But as Plaintiff concedes, "the doctrine of respondeat superior does not provide an independent

cause of action under New Jersey law." (ECF No. 16 at 18 (citing *Rowan v. City of Bayonne*, 474 F. App'x 875, 879 n.3 (3d Cir. 2012).) Plaintiff instead argues that (1) because Cenlar acted as an employee of CitiMortgage, any claims that survive against Cenlar should also be imputed to CitiMortgage, (ECF No. 15 at 18-19); and (2) Powers Kirn should be liable for any torts committed by its individual employees through their interactions with Plaintiff, (ECF No. 16 at 19).

First, Plaintiff has not asserted any tort claims against any individual Powers Kirn employees. Because the doctrine of respondeat superior "does not provide an independent cause of action" but must be based on "a viable underlying tort claim" Count Five is dismissed as to Powers Kirn. *See Reed v. Jersey City*, Civ. No. 21-3921, 2022 WL 1664621, at *8 (D.N.J. May 24, 2022 (citing *Carter v. Reynolds*, 815 A.2d 460, 463 (N.J. 2003)). Second, Plaintiff has already availed herself of the doctrine of vicarious liability against CitiMortgage at least with respect to Count Two (NJFCA), which Plaintiff specifically asserted against CitiMortgage. Therefore, a claim of respondeat superior as a separate cause of action is "simply redundant" and must be dismissed. *Merman c. City of Camden*, 824 F. Supp. 2d 581, 599 n.32 (D.N.J. 2010).

The remaining causes of action — Counts One (violations of Regulation X) and Four (FDCPA) — are not asserted against CitiMortgage, but Plaintiff appears to ask the Court to hold CitiMortgage liable for these violations under a theory of vicarious liability. (ECF No. 1-3 ¶¶ 98.) But the plain language of these statutes belies such a theory. Section 1024.41 of Regulation X imposes duties only upon a "servicer" of a mortgage, as opposed to an "owner or assignee," and Plaintiff has provided no authority to suggest that the doctrine of respondeat superior applies to violations of Regulation X. *See* 12 C.F.R. § 1024.41(a). Additionally, the FDCPA does not apply to CitiMortgage, the creditor of Plaintiff's mortgage, because creditors and assignees of mortgages are not "debt collectors" under the FDCPA. *See Sprague v. Neil*, 2007 WL 3085604, at *1 (M.D.

Pa. Oct. 19, 2007) (finding that a defendant mortgage creditor could not be held liable under the

FDCPA on a theory of respondeat superior because the FDCPA does not apply to creditors).  (ECF

No. 1-3 ¶¶ 10-11.)  Count Five is therefore dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss (ECF Nos. 13 & 14) are

**GRANTED** in part and **DENIED** in part.  An appropriate Order follows.

Dated: May 31, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

24